**Reverse and Remanded and Opinion Filed April 2, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-22-00803-CV

**PATRICK J. GRIBBIN, Appellant**

**V.**

**HOLLYFRONTIER CORPORATION; HOLLY FRONTIER PAYROLL SERVICES, INC,; HOLLYFRONTIER REFINING & MARKETING, LLC, ET AL., Appellees**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-20-11451**

## MEMORANDUM OPINION

Before Justices Molberg, Pedersen, III, and Nowell
Opinion by Justice Molberg

Appellant Patrick J. Gribbin appeals the trial court's summary judgment for appellees HollyFrontier Corp., HollyFrontier Payroll Services, Inc., Holly Frontier Refining & Marketing, LLC, HollyFrontier LSP Holdings, LLC, Sonneborn, LLC, HollyFrontier LSP Services, LLC, and Holly Refining & Marketing, Tulsa, LLC (collectively, HollyFrontier). In three issues, Gribbin contends genuine issues of material fact precluded summary judgment on his breach of contract claim. Because

we agree, we reverse and remand in this memorandum opinion. *See* TEX. R. APP. P. 47.1.

## Background

Gribbin sued his former employer, HollyFrontier, for breach of contract, alleging the company failed to pay him severance benefits under his employment agreement when he resigned following a material reduction in the scope of his duties. HollyFrontier generally denied Gribbin's claim and asserted affirmative defenses of waiver, estoppel, unclean hands, unjust enrichment, and revocation.

HollyFrontier moved for traditional summary judgment, arguing Gribbin was terminated without cause more than three years after the date of the employment agreement's execution; regardless of whether he was terminated or resigned, the right to severance expired three years after execution of the agreement; Gribbin failed to sign and return a release required by the employment agreement within twenty-one days of his termination; and the scope of Gribbin's duties was not materially reduced.

As pertinent here, the summary judgment record reflects that Gribbin worked for Sun Oil Company (Sunoco) when that company was acquired by HollyFrontier in 2009, at which point Gribbin and HollyFrontier entered into an employment agreement. Under the agreement, Gribbin and HollyFrontier agreed Gribbin's employment "may be terminated at any time by either the Company or Employee for any reason, with or without cause."

Section 3 of the agreement addressed severance benefits. Under subsection 3(a), captioned "Termination without Cause," if Gribbin (1) was terminated without cause within three years of the HollyFrontier takeover, (2) did not receive payments under a change-in-control agreement, and (3) complied with the employment agreement for one year following termination, he was entitled to twelve months' base salary paid bi-weekly plus additional lump sum payments to be paid twelve months after termination. According to subsection 3(c) of the agreement, payments under subsection 3(a) were "conditioned upon the execution, non-revocation, and delivery of a release agreement"—in a form attached to the agreement—"by employee within 21 days of the date of employee's termination of employment." Under subsection 3(d), captioned "Termination for Cause or Resignation," the parties agreed Gribbin would receive no severance benefits if he was terminated with cause or if he resigned his employment. But it also provided:

> Employee may resign with entitlement to full severance benefits and subject to the requirements of Sections 2(b)(i) and (iii) if the Company (i) reduces his salary; (ii) fails to offer incentive or bonus compensation opportunities at a level offered to other officers with similar responsibilities and salary grade level and with similar performance ratings; (iii) materially reduces the scope of his position; or (iv) compels Employee to move the primary location where he performs the duties of his position to a location more than fifty (50) miles from the present primary location where he performs the duties of his position.

Gribbin signed the employment agreement and also signed and returned—in 2009—the release referenced in subsection 3(c).

Prior to the reorganization of HollyFrontier Lubricants and Specialty Products (HFLSP) at issue here, Gribbin was Vice President of Specialties within HFLSP and President of Sonneborn, a HollyFrontier subsidiary. He was "the leader of the sales, marketing, technical, and research and development divisions of the Specialties America's division of" HFLSP. In June 2020, HollyFrontier hired Bruce Lerner as President of HFLSP. Gribbin reported directly to Lerner, who undertook a reorganization of the division. Gribbin said Lerner indicated there would be many changes and "we wouldn't recognize the company" after reorganization.

In his deposition, Lerner stated he believed Gribbin and Tony Weatherill occupied parallel positions in the company, and in the reorganization, he "did not want to have two parallel commercial leaders for two different subsets of the division." Gribbin would no longer report to HFLSP's president but to Weatherill, who was to be made Senior Vice President and Gribbin's superior. Lerner said Gribbin would inherit additional accountabilities because he would take on the largest segment of the division. Lerner said Gribbin would "have all of his original accountabilities plus the parallel accountabilities for the Petro-Canada organization in the Americas."

According to Gribbin, he and Weatherill were direct peers prior to the reorganization. Gribbin also said Lerner was considering assigning Gribbin's responsibilities for the research and development function and regulatory and quality control to himself or a new vice president for research and development. This

concerned Gribbin because he spent a significant amount—twenty-five to thirty percent—of his time on research and development matters. Further, Gribbin stated he would be stripped of his responsibilities and authority over marketing, product development, and technical services, as Weatherill was to assume authority over those areas of the division. This affected Gribbin's bonus and long-term incentive compensation and "would likely have caused a significant reduction in my total compensation." Gribbin would also no longer remain president of Sonneborn. In response to an interrogatory, HollyFrontier stated that prior to Weatherill's promotion to senior vice president, Gribbin was "responsible for leading the sales, marketing, technical services, and research and development for the Specialties Products in the Americas." After the reorganization, Gribbin "was responsible for leading the entire sales organization for the America's region, not only for Specialties Products but also for Finished Products."

Gribbin and Lerner had a conversation on July 20, 2020, during which Gribbin expressed concerns about his new role. Lerner told Gribbin to think about it and schedule a follow-up call. They spoke again on July 22, 2020, when Gribbin told Lerner that he viewed the reorganization as a demotion. Lerner laid out Gribbin's options, which were to try to give it a shot or have a conversation with human resources about a mutually agreeable settlement. Lerner stated he did not terminate Gribbin at the end of their conversation; "the matter was handed over to [Dale] Kunneman, who is the corporation's chief human resources officer." After the call,

–5–

Lerner emailed Gribbin, telling him, among other things, "I understand that you feel the reorganization is a demotion and that it seals off any future career path at [HollyFrontier]." Gribbin responded, "I was opening up a dialogue to discuss the reasons for my disappointment and not to provide a notice of resignation but to find a solution. I agree that what you are asking of me in the new role is a demotion and will be viewed as such by the organization and the industry. While it has never been my desire to leave HollyFrontier I am open to a conversation with Dale and/or Charlene to determine an equitable agreement and path forward." Gribbin later stated, in his declaration, that resigning was not his "original intent going into the meeting with Mr. Lerner," but he was open to a discussion with Kunneman regarding his "exit from the company." In his deposition, Lerner said Gribbin eventually expressed to him a desire that he did not want to work for the company anymore under the terms of the reorganization and stated Gribbin "informed me that he wanted to seek a way to exit the company." Lerner told Gribbin he had instructed Kunneman to design an equitable severance package for him.

HollyFrontier ultimately offered Gribbin $166,417.50 for a two-year non-solicitation agreement and a one-year noncompete clause and referenced August 14, 2020, as his final day of employment. Gribbin did not agree to the proposed retirement agreement because he believed its terms were less favorable than his 2009 employment agreement.

During his deposition, Lerner stated he did not know whether Gribbin's employment was terminated but stated that, eventually, discussions between the company and Gribbin's lawyer were not "seeming to come to resolution, and so [his] corporate credentials were frozen or canceled or whatever the right term is, that he no longer had access to computing systems and things of that nature and was asked to return his corporate property." In his declaration, however, Lerner stated that HollyFrontier terminated Gribbin. Kunneman stated Gribbin was terminated because Kunneman provided him a termination date when he first sent Gribbin his separation proposal. He said it was ultimately Gribbin's decision to end his employment because he decided not to accept his new role. Kunneman denied this was a resignation because, although the termination was based on decisions Gribbin made, "we had no other choice." Gribbin stated during his deposition that he did not resign but he was in discussions with the company regarding his exit when "the company chose to terminate" him.

The trial court granted HollyFrontier's motion for summary judgment and dismissed with prejudice Gribbin's cause of action. This appeal followed.

## Discussion

To obtain a traditional summary judgment, a defendant must conclusively disprove an element of the plaintiff's claim or conclusively prove every element of an affirmative defense. *Harris v. Fossil Grp., Inc.*, 682 S.W.3d 896, 901 (Tex. App.—Dallas 2023, pet. granted). The summary judgment movant has the burden

to show no genuine issue of material fact exists and it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c). In deciding whether a genuine issue of material fact exists, we take as true evidence favorable to the nonmovant and indulge every reasonable inference in favor of the nonmovant. *Sandberg v. STMicroelectronics, Inc.*, 600 S.W.3d 511, 521 (Tex. App.—Dallas 2020, pet. denied). We review orders granting summary judgment de novo. *Bean v. Bean*, 658 S.W.3d 401, 410 (Tex. App.—Dallas 2022, pet. denied).

In granting summary judgment here, the trial court did not specify the basis for its ruling, so Gribbin must show that each of the independent grounds alleged in HollyFrontier's motion is insufficient to support the order. *Vassar Group, Inc. v. Heeseon Ko*, No. 05-18-00814-CV, 2019 WL 3759467, at *3 (Tex. App.—Dallas Aug. 9, 2019, no pet.) (mem. op.).

We begin with HollyFrontier's contention that Gribbin was entitled to severance benefits under the employment agreement only if he resigned or was terminated without cause within three years of the takeover. HollyFrontier argues that even if Gribbin had resigned, benefits under subsection 3(d) of the contract are time-limited in the same manner as those in subsection 3(a) because subsection 3(d) refers to "entitlement to full severance benefits" without defining the nature of those benefits. Thus, Holly Frontier argues, we must look to subsection 3(a) to understand the severance benefits to which Gribbin may be entitled. Because under subsection 3(a) Gribbin is entitled to benefits only if he is terminated without cause within three

–8–

years of the execution of the agreement, subsection 3(d) should not be read to expand the benefits described in subsection 3(a). Gribbin, on the other hand, argues the three-year limit under subsection 3(a) is not included in the text of subsection 3(d) and should not be read into the provision.

As we have stated previously:

> When construing a contract, our primary goal is to determine the parties' intent as expressed in the terms of the contract. Contract language that can be given a certain or definite meaning is not ambiguous and is construed as a matter of law. A contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. We review an unambiguous contract de novo. When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue.

*McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 826 (Tex. App.—Dallas 2010, no pet.) (internal citations omitted). We construe contracts in a manner to avoid rendering any language superfluous. *Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 477 (Tex. 2016).

We reject HollyFrontier's reading of these provisions. The text of subsection 3(d) does not include any time limit. Further, subsection 3(d) explicitly includes other conditions on Gribbin's entitlement to benefits following resignation: it specifies that such entitlement is subject not only to the resignation conditions spelled out in the subsection, but "to the requirements of Sections 2(b)(i) and (iii)," that is, to the agreement's non-competition and non-solicitation-of-business-relationships provisions. This explicit conditioning of benefits under subsection 3(d)

–9–

would be rendered superfluous if we adopted HollyFrontier's reading of the agreement because subsection 3(a) already specifies in its third condition that Gribbin must "compl[y] with the agreement"—including the non-competition and non-solicitation provisions—"for one year following the employee's termination date."

Moreover, although subsection 3(d)'s "entitlement to full severance benefits" must implicitly refer to subsection 3(a)'s definition of those benefits, we cannot agree it imports subsection 3(a)'s particular conditioning of benefits following termination without cause. The structure of subsection 3(a) supports our conclusion. Under that subsection, HollyFrontier "shall pay to the employee the following amounts if" conditions X, Y, and Z are met. Condition X is "the Employee's employment with the Company is terminated without Cause within three years of the sale of the Tulsa refinery to [HollyFrontier]"; condition Y is "the Employee does not receive payments due to a change in control situation that is addressed by a separate Change-in-Control Agreement . . ."; and condition Z is "the Employee complies with this agreement for one year following the Employee's termination date." The benefit amounts are then defined in subsections 3(a)(i)–(iii). Thus, the three-year limit in condition X relates specifically to "termination without cause" addressed in that condition and not generally to the severance benefits defined in subsections 3(a)(i)–(iii). Because the parties agreed to include some conditions and

limits on benefits under subsection 3(d) but not others, we cannot read into the contract those conditions to which the parties did not agree.

We now consider HollyFrontier's contention that summary judgment was proper because Gribbin failed to return the required release under subsection 3(c). As noted above, according to subsection 3(c), "payments under Section 3(a) shall be conditioned upon the execution, non-revocation, and delivery of a Release Agreement . . . by Employee within 21 days of the date of Employee's Termination of Employment." HollyFrontier argues that, because subsection 3(d) refers only to "full severance benefits" and implicitly relies on subsection 3(a) to define severance benefits, Gribbin sought "payments under Section 3(a)" and a release was therefore required. Gribbin argues he sought payments under subsection 3(d), not subsection 3(a), because he resigned or was trying to resign when he was terminated, and subsection 3(c) does not require the return of a release for payments under subsection 3(d).

Although neither party argues the contract is ambiguous, this Court may conclude a contract is ambiguous even in the absence of such a pleading or claim by either party. *KSWO Television Co., Inc. v. KFDA Operating Co., LLC*, 442 S.W.3d 695, 704 (Tex. App.—Dallas 2014, no pet.); *United Protective Servs., Inc. v. W. Vill. Ltd. P'ship*, 180 S.W.3d 430, 432 (Tex. App.—Dallas 2005, no pet.). As stated above, a contract is ambiguous when its meaning is uncertain or it is reasonably susceptible to more than one meaning. *See McAfee, Inc.*, 316 S.W.3d at 826. In

–11–

*Arredondo v. City of Dallas*, 79 S.W.3d 657, 669 (Tex. App.—Dallas 2002, pet. denied), we concluded a contractual provision was reasonably susceptible to more than one meaning when nothing in the contract indicated the provision had a limited or broad meaning. The City adopted an ordinance—which was for purposes of our review the "contractual provision at issue"—granting certain police officers and fire fighters a pay increase; it also ordained that the "current percentage pay differential between grades in the sworn ranks of the Dallas Police Force and the Fire Fighter and Rescue Force shall be maintained." *Id.* at 668. The City contended the word "maintain" was limited to a "one-time across-the-board salary increase," while the plaintiffs argued it required "both the continuation of the existing percentage pay differential in calculating the raise in clause 1 and that the percentage pay differential must be kept exactly the same in all future pay resolutions." *Id.* We stated the ordinance contained no "indication whether the word 'maintain' is temporally limited," concluded its meaning was patently ambiguous, and reversed the summary judgment because "resolution of the ambiguity issue requires a determination by the fact-finder as to the intent of the parties to the contract." *Id.*

Here, subsection 3(a) both defines the conditions required for severance benefits following termination without cause and contains the agreement's only definition of severance benefits, which the parties agree are the "full severance benefits" referred to in subsection 3(d). "Payments under section 3(a)," therefore, may reasonably refer to payments following a termination without cause or to any

–12–

payment of the severance benefits defined in subsection 3(a). As in *Arredondo*, nothing in the contract indicates whether this provision carries the more limited, former meaning. Accordingly, we must conclude the agreement is ambiguous as to whether "payments under Section 3(a)" refers to payments following termination without cause or more generally to the payment of severance benefits defined in section 3(a). Because this provision is reasonably susceptible of two meanings, its interpretation raises a fact issue and, to the extent the trial court relied on this ground, the granting of a motion for summary judgment on it was improper. *See McAfee, Inc.*, 316 S.W.3d at 826.

Additionally, supposing the release was required, Gribbin raised a fact question as to whether HollyFrontier repudiated the employment agreement's severance benefits provisions, thus excusing Gribbin's obligation under the agreement to provide the release within twenty-one days of termination. Under the doctrine of repudiation, an injured party is discharged from its remaining duties to perform under a contract where the other party repudiates its contractual duty before the time for performance. *Sci. Mach. & Welding, Inc. v. FlashParking, Inc.*, 641 S.W.3d 454, 463 (Tex. App.—Austin 2021, pet. denied). Traditionally, "repudiation occurs when the promissor unequivocally disavows any intention to perform in the future." *Id.* The question of repudiation generally "is one of fact, to be determined by the trier of facts." *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983). Gribbin stated in his declaration that HollyFrontier refused to provide him full

–13–

severance benefits under the employment agreement and only offered him a lesser amount. HollyFrontier does not contend Gribbin would have been owed severance benefits under the agreement had he properly returned the release; it argues he was not owed benefits under the agreement, and in any event, he also failed to return the release. Thus, a fact question exists as to whether HollyFrontier disavowed any obligation to pay severance benefits under the agreement before Gribbin's release was due under the agreement.

We next consider whether genuine issues of fact exist as to whether Gribbin was terminated without cause. HollyFrontier argues no genuine issue of fact exists and Gribbin was terminated without cause. Gribbin argues there are fact questions about whether he resigned or whether he was terminated by HollyFrontier while he was in the process of resigning so the company could avoid paying severance under the employment agreement. In sum, the summary judgment record, described above, reflects that Gribbin informed the company he did not want to stay on following Lerner's reorganization, he engaged in discussions with the company about his exit, and he was ultimately given a termination date by the company. Given this, we conclude that whether Gribbin resigned, was terminated without cause, or whether he was terminated while in the process of resigning is a genuine issue of material fact. Although, as HollyFrontier argues, Gribbin himself stated in his deposition he was terminated by the company, fact issues nevertheless remain as to whether HollyFrontier terminated Gribbin before he could resign. If so, the

company cannot rely on nonfulfillment of the resignation-condition to deny benefits. *See Sellers v. Minerals Techs., Inc.*, 753 Fed. Appx. 272, 278 (5th Cir. 2018) (per curiam) ("Under Texas jurisprudence, if one party prevents another from performing a condition precedent or renders its fulfillment impossible, then the condition may be considered fulfilled.").

Finally, HollyFrontier argued in its motion for summary judgment that, even if Gribbin resigned, he was not entitled to benefits under the employment agreement because the company did not materially reduce the scope of his position. On appeal, HollyFrontier argues the "reality is Gribbin's position would not have been reduced" but he "was simply frustrated he did not receive a promotion he believed he was entitled to." Gribbin argues his summary judgment evidence "at least creates a fact question that there was a material reduction in the scope of his position." Given that we must take as true evidence favorable to Gribbin and indulge every reasonable inference in his favor, *see Sandberg*, 600 S.W.3d at 521, we agree with Gribbin. The record reflects that the scope of his position prior to the reorganization included responsibility and authority over sales, marketing, technical services, and research and development divisions of the specialties division of HFLSP. Gribbin presented evidence indicating he would no longer have authority over marketing, technical services, or research and development, would no longer be president of Sonneborn, and would no longer report directly to the president of HFLSP, while Lerner stated Gribbin would retain his "original accountabilities." Relatedly, Gribbin presented

–15–

evidence that his compensation would be reduced given the loss of these responsibilities. HollyFrontier disputed this. Given these factual disagreements, we conclude HollyFrontier has failed to demonstrate no genuine issue of material fact exists as to whether the reorganization materially reduced the scope of Gribbin's position. We sustain Gribbin's three issues.

## Conclusion

We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

220803f.p05

/Ken Molberg/
KEN MOLBERG
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PATRICK J. GRIBBIN, Appellant

No. 05-22-00803-CV     V.

HOLLYFRONTIER
CORPORATION; HOLLY
FRONTIER PAYROLL SERVICES,
INC,; HOLLYFRONTIER
REFINING & MARKETING, LLC,
ET AL., Appellees

On Appeal from the 44th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-20-11451.
Opinion delivered by Justice
Molberg. Justices Pedersen, III and
Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellant PATRICK J. GRIBBIN recover his costs of this appeal from appellees HOLLYFRONTIER CORPORATION; HOLLY FRONTIER PAYROLL SERVICES, INC,; HOLLYFRONTIER REFINING & MARKETING, LLC, ET AL..

Judgment entered this 2nd day of April, 2024.